UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : Criminal Number:   05-368-01 (HHK) |
| v. | : |
| **KIMBERLY HOWARD,** | : |
| Defendant. | : |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, hereby submits in the above-referenced matter this memorandum in aid of sentencing of defendant Kimberly Howard and motion for a three-level decrease for acceptance of responsibility.  As will be discussed below in more detail, the government:  (1) moves for a three-level decrease in defendant's offense level because defendant appropriately accepted responsibility; (2) requests that defendant receive a two-level decrease in her offense level because of her minor role in the criminal activity pursuant to USSG § 3B1.2(b); and (3) requests that, pursuant to the plea agreement, the Court order defendant to pay restitution of $125,748.32 in the Presentence Investigation Report ("PSR").

### I. FACTUAL BACKGROUND

On November 18, 2005, defendant Kimberly Howard pled guilty before the Court to a one-count Indictment charging her with conspiracy to commit access device fraud, in violation of 18 U.S.C. § 371.

As agreed to by defendant and set forth in the Statement of Offense and the Presentence Investigation Report ("PSR"), at pages 4-6, at all times material to the conspiracy, American Express and VISA were companies which issued credit cards containing credit card numbers and had activity which affected interstate commerce. Credit card numbers were "access devices" in that they could be used, alone or in conjunction with the expiration date, to obtain money, goods, services, or anything of value. Magruder's #18, located at 5626 Connecticut Avenue, N.W., Washington, D.C. ("Magruder's"), was a grocery store which sold staple food items, meats, produce, dairy products and household supplies. Customers of Magruder's purchased items using a variety of payment methods including paying with credit cards. For each credit card transaction, Magruder's maintained receipts which contained credit card numbers and expiration dates of customers (victims). Between August 2003, and January 2004, defendant Kimberly Howard worked as a cashier at Magruder's.

Between on or about October 2003, and on or about March 2004, while in the District of Columbia and elsewhere, defendant Kimberly Howard, along with others, conspired to fraudulently acquire goods by stealing credit card receipts containing credit card numbers and credit card expiration dates of Magruder's customers ("victim information"). Co-conspirator Renodo Taylor used the victim information to purchase merchandise on behalf of third parties, who, upon delivery of the merchandise, paid co-conspirator Renodo Taylor a fraction of the retail value of the delivered merchandise.[1]

As a part of the conspiracy, defendant Kimberly Howard stole credit card receipts

---

[1] On May 13, 2005, Renodo Taylor plead guilty before this Court in case number CR05-153-01 to one-count of conspiracy to commit access device fraud, in violation of 18 U.S.C. § 371. Taylor was subsequently sentenced by this Court on December 2, 2005.

containing victim information from Magruder's. It was a further part of the conspiracy that defendant Kimberly Howard gave the stolen victim information to co-conspirator Renodo Taylor in exchange for $150. It was further part of the conspiracy that co-conspirator Renodo Taylor, while in the District of Columbia, would identify individuals who needed building supply materials and home appliances. Once identified, co-conspirator Renodo Taylor agreed to provide these individuals ("recipients") with new building supply materials and/or home appliances at a fraction of the retail value. For each transaction, co-conspirator Renodo Taylor used the victim information, to purchase merchandise such as refrigerators, washing machines, dryers and wood flooring from various retailers. These building supply stores included but are not limited to The Home Depot, Lowe's, Bray & Scarff and Universal Floors. At times, co-conspirator Renodo Taylor used the telephone to purchase merchandise from stores located outside the District of Columbia and requested that the purchased merchandise be delivered to various addresses within the District of Columbia. It was a further part of the conspiracy that, on at least one occasion, co-conspirator AS agreed to accept delivery of the merchandise within the District of Columbia.

Upon receipt of the goods, the recipients would pay co-conspirator Renodo Taylor a cash amount equal to approximately one-third the retail value of the merchandise he received. As part of the conspiracy, co-conspirator Renodo Taylor would pay co-conspirator AS and defendant Kimberly Howard a portion of the cash he received from the recipients.

It was a further part of the conspiracy that defendant Kimberly Howard, in conjunction with co-conspirators Renodo Taylor, AS and others, caused an actual loss to American Express and VISA in excess of $125,700, in that co-conspirator Renodo Taylor used more than one unauthorized access device, during a one-year period, and by such conduct obtained things of

value in excess of $1,000. In addition, from in or about August 2003, through March 2004, defendant Kimberly Howard, in conjunction with other co-conspirators, obtained victim information from Magruder's and used the victim information obtained from 2 American Express accounts and 21 Visa accounts to attempt the purchase of merchandise valued at $79,141.90.

## II. UNITED STATES SENTENCING GUIDELINES

The United States Sentencing Guidelines, § 3E1.1, provides for a two-level decrease in a defendant's offense level for acceptance of responsibility, and, upon motion of the government, for a defendant whose level is 16 or greater and who has in a timely manner advised the government of the defendant's intent to plead guilty, an additional one-level decrease. The defendant meets the criteria for a three-level decrease and the government hereby moves that the Court grant her a three-level decrease in her offense level for acceptance of responsibility. In addition the United States Sentencing Guidelines, § 3B1.2(b), provides for a two-level decrease in a defendant's offense level if the defendant was a minor participant in criminal activity. Likewise, the government hereby moves that the Court grant defendant a two-level decrease in her offense level for her role as a minor participant in the crime.

The probation officer believes, and the United States concurs, that the defendant's total offense level, incorporating the three-level decrease for acceptance of responsibility and two-level reduction for her role as a minor participant, is 13, her criminal history is I, and her guideline range is 12 to 18 months of imprisonment. PSR, at pages 6-7 , ¶¶ 20-32, and page 13, ¶ 65. According to the PSR, the defendant falls within Zone D of the Sentencing Table, which specifies that defendant is not eligible for probation. Id., at pages 13-14, ¶¶ 64-71.

### III. IMPACT OF U.S. v. BOOKER ON THE SENTENCING GUIDELINES

There are no facts involved in the calculation of defendant's sentence under the United States Sentencing Guidelines to which defendant did not admit in her guilty plea in this matter. Accordingly, there are no Sixth Amendment concerns in the calculation of her sentence under those Guidelines. However, the Supreme Court has now held that the Sentencing Guidelines are no longer mandatory. Nevertheless, for the reasons set forth below, the government requests that the Court use the Sentencing Guidelines in determining the sentence of defendant in this case.

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). In consequence, the Court invalidated the statutory provision that made the Guidelines mandatory: Title 18, United States Code, § 3553(b)(1). Booker, 125 S. Ct. at 756; United States v. Price, 409 F.3d 436, 442-43 (D.C. Cir. 2005). However, the Court expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld the remainder of the Guidelines as a benchmark for informing courts as to what would be a reasonable sentence for a particular defendant who has committed a particular crime. The sentence will then be subject to review by courts of appeals for "reasonableness." See Booker, 125 S. Ct. at 766; Price, 409 F.3d at 441, 442.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law in order to calculate correctly a defendant's sentence under the existing Sentencing Guidelines. See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when

sentencing." Booker, 125 S. Ct. at 767 (citing 18 U.S.C.A. §§ 3553(a)(4)&(5) (Supp. 2004)). See Price, 409 F.3d at 442-43. In light of this mandate, it is plain that a sentence within the Guidelines, while not required, is presumptively reasonable. Not only is a sentence within the Guidelines range presumptively reasonable, it also accommodates the salutary goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in Section § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See United States v. Price, 409 F.3d at 442 (listing the factors that guide sentencing).

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practices and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Commission, Supplementary Report on the

6

Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court. Every Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 ("Congress' basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity"). Since the Guidelines represent

the only extant benchmark to encourage uniformity and thus the only tool to implement the Congressional vision of sentencing uniformity and fairness, Guidelines range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See id. at 766; Price, 409 F.3d at 441, 442. Nevertheless, the Guidelines – resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. § 3553(a) – provide the most concrete yardstick against which to measure what would be reasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review. See Section 3553(c) (mandating consideration of the Guidelines); Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reason in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. In this case, no unusual circumstances exist that

warrant an exception to the preference for Guidelines sentencing. Therefore, the government respectfully recommends that the Court sentence defendant according to the Guidelines.

### IV. **RECOMMENDATIONS**

Defendant pled guilty to one count of conspiracy to commit credit card fraud for her role in a scheme to fraudulently purchase merchandise by using credit card information stolen from a local grocery store. Defendant's actions caused actual and intended losses in excess of $200,000. This conduct, with its resulting harm to the credit card holders and retailers was serious conduct that needs to be adequately punished. Moreover, beyond the immediate financial losses suffered by the retailers identified in the PSR, credit card fraud has the associated effects of increasing costs to all consumers. Indeed, law-abiding consumers must bear the burden of paying the costs of increased security to prevent fraud in the form of higher credit card fees, higher interest rates and higher costs of merchandise. Furthermore, victims of credit card fraud often lose their confidence in the credit system. Unfortunately, credit card fraud is a serious and too often recurring matter.

In this case, the government is requesting that the Court grant defendant a three-level decrease for acceptance of responsibility, grant defendant a two-level decrease fro her role as a minor participant and order that defendant pay restitution. As discussed above, defendant has appropriately accepted responsibility. The resulting offense level as set forth in the PSR is 13. With a criminal history category of I, defendant falls within the sentencing range of 12 to 18 months. Furthermore, in the plea agreement, at page 2, ¶ 3, defendant agreed to pay restitution to the victims of her crimes. Consistent with the agreement and the determination of the probation

officer, the United States requests that the Court order defendant to pay restitution of $125,748.32 to the victims identified in the PSR, at page15, ¶¶ 78-80.

## V.  CONCLUSION

WHEREFORE, the government respectfully requests that the Court grant defendant a three-level decrease for acceptance of responsibility, a two-level decrease fro her role as a minor participant and order defendant to pay restitution in the amount determined in the Presentence Investigation Report.

                    Respectfully submitted,

                    KENNETH L. WAINSTEIN
                    United States Attorney


                    RONALD W. SHARPE
                    Assistant United States Attorney
                    Fraud and Public Corruption Section
                    D.C. Bar No. 434575
                    555 4th Street, N.W., Room 5828
                    Washington, D.C.  20530
                    (202) 353-9460
                    ronald.sharpe@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion has been served by facsimile and first-class mail on counsel for defendant, Bruce A. Johnson, Jr., LLC, 4301 Northview Drive, Bowie, Maryland  20716, this 19th day of January 2006.